## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

ROSE MARTINEZ,

       Plaintiff,

v.                                     No. Civ. 04-0612 JCH/RHS

RIO ARRIBA COUNTY, MOISES MORALES,
ELIAS CORIZ, ANDREW CHAVEZ, LORENZO
VALDEZ, in their individual capacity,

       Defendants.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Rio Arriba County, Moises Morales, Elias Coriz, Andrew Chavez, and Lorenzo Valdez's (collectively, "Defendants") Motion for Summary Judgment (Doc. No. 35, filed June 28, 2005) and Defendants' Motion for Summary Judgment on Qualified Immunity (Doc. No. 36, filed June 28, 2005). The Court, having considered the pleadings submitted by the parties, the applicable law, and otherwise being fully advised, finds that both motions are well-taken and will be granted.

## I.    FACTUAL BACKGROUND

The following facts are either undisputed or are relevant facts, established by admissible evidence, that most favor Plaintiff Rose Martinez ("Plaintiff").

Plaintiff served as Human Resource Director for Defendant Rio Arriba County ("the County") from July 1998 through August 2003. Defs.' Mem. in Supp. of Mot. for Summ. J. (Doc. No. 38) ("Defs.' Summ. J. Mem."), Undisputed Fact 2. Plaintiff created the Human Resource Department ("HRD"). Compl. ¶ 11; Defs.' Summ. J. Mem., Ex. 3 at 1. As Human Resource Director, Plaintiff was part of the County Manager's management team. Rose Martinez

Dep. at 53.  Plaintiff worked under the discretion and was responsible to the County Manager. *Id.*  Plaintiff reported directly to the Assistant County Manager, who reported to the County Manager, who in turn reported to the County Commissioners.  *See* Tomas Campos Dep. at 10; Lorenzo Valdez Dep., Ex. 1 (County of Rio Arriba Organizational Chart).  At the time of the events alleged in the Complaint, Defendants Moises Morales, Elias Coriz, and Andrew Chavez served as Rio Arriba County Commissioners, and Defendant Lorenzo Valdez served as the Rio Arriba County Manager.  Defs.' Summ. J. Mem., Undisputed Fact 1.

The Human Resource Director position is an unclassified, exempt position outside the ambit of civil service protection.  Defs.' Summ. J. Mem., Undisputed Fact 2.  Plaintiff understood that her position was "at will" and that she could be terminated from her position with or without cause.  *Id.*

Plaintiff's responsibilities as Human Resource Director included assisting other directors with the recruitment and selection process, job descriptions, employee evaluations, technical assistance on personnel issues, and assisting the County Safety Officer and Payroll Department with their responsibilities.  Rose Martinez Dep. at 53.  Plaintiff did not have a say in hiring or firing employees.  Rose Martinez Aff. at ¶ 5.  Plaintiff did, however, ask questions of applicants during interviews and prepared necessary paperwork following the County hiring a person.  Rose Martinez Interrogatories at 13.  Plaintiff would also on occasion make strong recommendations to directors and others on behalf of certain applicants.  *See* Jessica Madrid Dep. at 20-21, 49; Joe Mascarenas Dep. at 16-17.  Plaintiff considered herself a high level cabinet/management member of the County management team.  Rose Martinez Dep. at 64.  As the Human Resource Director, Plaintiff would attend director meetings once a month with the County Commissioners and other

2

directors. Defs.' Summ. J. Mem., Undisputed Fact 6. The directors would discuss what they were doing in their departments and what help they needed from other directors. *Id.* Plaintiff had only one employee working under her in the HRD. Rose Martinez Aff. at ¶ 5.

Plaintiff's job description stated that the Human Resource Director was to represent the County on boards, commissions, and community organizations. Rose Martinez Dep. at 53. The job description also stated that the Human Resource Director is responsible for planning, coordinating, and directing personnel functions, including personnel policies and procedures, personnel records and contracts, classification and compensation studies. Defs.' Summ. J. Mem., Ex. 2 at 1. Plaintiff also ensured the County complied with all personnel policies and procedures and with state and federal law that related to hiring. *Id.*, Ex. 2 at 1; Rose Martinez Dep. at 172-73. In addition, Plaintiff's duties included assisting the County Manager with the recruitment and selection process; assisting departments and/or screening committees on proper interviewing and screening procedures; recommending revisions to the personnel handbooks for County Commission approval; being responsible for personnel grievances, including legal consultation and writing related reports and correspondence; being responsible for all complaints filed with the courts or state or federal agencies; advising the County Manager and other directors on personnel matters; and reviewing with County legal counsel and the County Manager all personnel and human resource matters. Defs.' Summ. J. Mem., Ex. 2 at 1-2.

Plaintiff, however, states that she had no policymaking authority, but rather, only implemented policy. Rose Martinez Aff. at ¶ 4. The Human Resource Director could only help enforce policies passed by the Commission. *Id.* at ¶ 3. The County Manager made policy changes in writing and delegated policy and procedures that the Commission set. *Id.* at ¶ 4; Elias

Coriz Aff. at 57.  The Rio Arriba County Personnel Handbook was signed by the County

Manager and the three County Commissioners.  Rose Martinez Aff. at ¶ 6 & attached exhibit.

Plaintiff's supervisor, Assistant County Manager Tomas Campos, was satisfied with

Plaintiff's day-to-day performance on human resource issues.  Campos Dep. at 12.  Commissioner

Andrew Chavez believed that Plaintiff was an asset to the County.  Andrew Chavez Dep. at 35.

Director Norman Martinez thought Plaintiff did an outstanding job as Human Resource Director.

Norman Martinez Dep. at 33.  Defendant Morales never had any problems with Plaintiff's

performance as Human Resource Director.  Moises Morales Dep. at 81.  Plaintiff was

professional and strictly followed the County handbook.  Georgia Cordova Dep. at 22, 26-27.

At some point while working as Human Resources Director, Plaintiff ran for political

office and was elected to the school board.  Rose Martinez Aff. at ¶ 8.

In 2000, Plaintiff received correspondence from certain detention center employees who

raised several issues concerning an unsafe work environment, including the possibility of a riot, at

the detention center.  *See* Rose Martinez Interrogatories at 11; Rose Martinez Dep. at 85-86.

Plaintiff was not in charge of the detention center and did not have oversight of it. Rose Martinez

Aff. at ¶ 1.  Nevertheless, because of concerns for the safety of inmates, employees, and the

potential liability to the County, Plaintiff wrote a letter to the Detention Center Administrator,

Anthony Valdez, and Defendant Lorenzo Valdez in which she strongly suggested that the

detention center employees' concerns be addressed.  *See* Rose Martinez Interrogatories at 11;

Rose Martinez Aff. at ¶ 1; Rose Martinez Dep. at 86.  Defendant Valdez did not address the

concerns.  Rose Martinez Interrogatories at 11.  A riot occurred a few months later.  *Id.*

In 2002, Plaintiff challenged that the County's random drug testing was not following

4

federal or county regulations.  Rose Martinez Aff. at ¶ 7.  Tomas Campos asked Georgia

Cordova, a County employee, to change the names of the employees that were to be randomly

tested.  *See* Georgia Cordova Dep. at 16-18.  In one instance, Mr. Campos told Ms. Cordova to

add the name of an employee that he did not like to the random drug testing list.  *See id.* at 64.

After Plaintiff made this challenge, the task was removed from Plaintiff.  Rose Martinez Aff. at

¶ 7.  The HRD was no longer allowed to view the random drug testing records.  Georgia

Cordova Dep. at 16.

    Many of the persons hired for positions with the County were relatives and friends of

Commissioners and the County Manager.  *See* Norman Martinez Dep. at 32-33.  The

Commissioners generally made strong recommendations to Defendant Valdez about hiring certain

employees.  Valdez Dep. at 5.

    In December 2002, an Equipment Operator position with the County opened.  *See* Rose

Martinez Interrogatories at 10.  A few days later, Felix Archuleta, a County employee, expressed

his interest in the position to Plaintiff.  *Id.* at 9-10.  Plaintiff told Mr. Archuleta that she could not

give him any other information until Anthony Griego submitted a "Request to Hire."  *Id.* at 10.

    In January 2003, Manuel Sanchez, Defendant Morales' brother-in-law, submitted an

application for the Equipment Operator position.  *Id.*  Defendant Morales wanted the County to

hire Manuel Sanchez for the position and made his views known to Anthony Griego, Tomas

Campos, and Defendant Valdez.  *See* Campos Dep. at 13, 16, 20-21; Rose Martinez

Interrogatories at 10.  A few days later, Mr. Griego and Mr. Campos requested the applications

on file for the Road Department.  Plaintiff sent the four applications to them, including Manuel

Sanchez's.  Rose Martinez Interrogatories at 10.  Plaintiff advised Mr. Griego and Mr. Campos to

follow the hiring procedures set forth in the Personnel Handbook. *Id.* Both Mr. Griego and Mr. Campos indicated that Defendant Morales wanted Manuel Sanchez hired. *Id.* Plaintiff then told them, and later Defendant Valdez, that such a hiring might make the County liable. *Id.*

Plaintiff subsequently spoke with Defendant Morales, requesting that the County follow its hiring procedures. *Id.* Defendant Morales responded that he had never hired one of his relatives and that he was hiring Manuel Sanchez and did not care who liked it or not. *Id.* When she was unable to convince him otherwise, Plaintiff documented the events. *Id.* Defendant Valdez later called her and indicated that there was no need for her to document the events in detail. *Id.*

On January 16, 2003, the County hired Manuel Sanchez without posting the position or holding interviews, calling it an emergency hire. *See* Campos Dep. at 19, 24-25; Rose Martinez Interrogatories at 9; Rose Martinez Dep. at 120. The County hired Manuel Sanchez despite the fact that he did not possess a New Mexico CDL driver's license, which the job description required. Rose Martinez Interrogatories at 10. Manuel Sanchez later acquired the necessary license. Rose Martinez Interrogatories at 10-11. Plaintiff voiced to Mr. Campos her views that the hiring was wrong and did not follow procedures. Campos Dep. at 19-20.

Felix Archuleta later filed suit against the County. Rose Martinez Interrogatories at 10. On May 27, 2003, R. Galen Reimer, an attorney for the County, called Plaintiff for information on the Felix Archuleta case. *Id.* Plaintiff told him about the aforementioned events. *Id.* at 10-11. Plaintiff asked Mr. Reimer what she should do if the case went to court, and he told her to tell the truth. *Id.* at 11. Plaintiff later indicated to Mr. Campos that she would tell the truth in Felix Archuleta's case that the hiring was political and did not follow County procedures. *See* Campos Dep. at 21-22.

Defendant Valdez heard rumors that Plaintiff may have been coaching people, including Mr. Archuleta, to sue.  Valdez Dep. at 172-73.  Defendant Valdez discussed this rumor with Mr. Campos.  *Id.*  Defendant Valdez believed that such an action would have been disloyal because Plaintiff had a responsibility to protect the County from lawsuits.  *Id.*

During her employment, Plaintiff also learned that the HRD did not have access to employee leave records, and the Finance Department refused to advise Plaintiff whether any employees were on extended leave.  Rose Martinez Interrogatories at 18.  Plaintiff needed this information in order to comply with the Family and Medical Leave Act ("FMLA").  *See id.* Plaintiff needed the documentation to determine how long employees had been on leave.  Rose Martinez Dep. at 72.  The documents that the Finance Department did provide to the HRD were in such a state of confusion that Plaintiff could not keep up with FMLA requirements.  *See* Rose Martinez Interrogatories at 18.  Nor could Plaintiff ensure that FMLA was offered to eligible employees.  *See id.* at 9.  Plaintiff informed Defendant Valdez and the County Attorney that the County was out of compliance with the FMLA.  *See* Rose Martinez Aff. at ¶ 2.  Plaintiff also reported to the County Attorney that Defendant Valdez was not letting Plaintiff get access to the necessary paperwork to be in compliance.  *Id.*  Nevertheless, approximately two or three months after Plaintiff requested the documents, Plaintiff did get the documents, but in a format that made the job difficult for her to complete.  *See* Rose Martinez Dep. at 68-70.  Despite these difficulties, Plaintiff was able to complete the HRD tasks for which she needed the documents.  *Id.*

On March 12, 2003, Plaintiff received a call from Billy Hinds who complained to her about the way Anthony Valdez was treating him.  Rose Martinez Dep. at 80-81, 85; Defs.' Reply Br. to Pl.'s Mem. in Supp. of Resp. to Defs.' Mot. for Summ. J. (Doc. No. 54) ("Defs.' Reply"),

Ex. 19 at 1.  During this conversation, Defendant Morales came into Plaintiff's office.  Rose

Martinez Dep. at 82.  After the conversation ended, Defendant Morales asked Plaintiff about the

conversation.  *See id.*  Plaintiff responded that she did not know how to address the detention

center employees who contacted her and that she kept sending them back to Anthony Valdez.  *Id.*

at 83.  Plaintiff and Defendant Morales continued talking, discussing detention center employee

complaints about faulty equipment, absenteeism, and working double shifts as well as the riot that

had occurred years ago.  *See id.*  Plaintiff never during this conversation said that a riot was going

to happen.  *Id.*  Defendant Morales told Plaintiff that he needed to address the detention center.

*Id.*  Plaintiff's response was, "Well, really?  I think that they're trying to address it."  *Id.*

        Defendant Morales later talked to Anthony Valdez to try to determine whether there were

problems at the jail.  *See* Morales Dep. at 30.  Plaintiff received a call from Anthony Valdez in

which he stated that Defendant Morales told him that Plaintiff was saying that Anthony Valdez

was not paying attention to his staff's concerns and that the detention center was close to another

riot.  Rose Martinez Dep. at 84-85; Defs.' Reply, Ex. 18.  Plaintiff told Mr. Valdez that

Defendant Morales did not recount the conversation correctly and asked Mr. Valdez to write a

letter to document the conversation, which he did.  Rose Martinez Dep. at 84-85; Defs.' Reply,

Ex. 18.

        Defendant Valdez perceived that Plaintiff was politically aligned with Commissioner

Chavez.  Valdez Dep. at 168.  Commissioner Chavez had a strained relationship with Defendant

Valdez and did not prefer Defendant Valdez as County Manager.  *Id.* at 167.  Defendant Valdez

heard that Plaintiff had visited Commissioner Morales and proposed a new alignment of political

factions – an alignment between Commissioners Morales and Chavez.  *Id.* at 168.  Defendant

Valdez also heard that Plaintiff had discussions with Commissioners to request that Defendant Valdez be dismissed as County Manager. *Id.* at 62. Defendant Valdez, however, did not know whether or not Plaintiff actually had attempted to get him replaced. *See id.* at 75-76. Plaintiff states that she never attempted to convince Defendant Morales to fire Defendant Valdez. Rose Martinez Interrogatories at 15.[1] Plaintiff, however, made comments to her subordinate, Jessica Madrid, indicating that she would like Defendant Valdez to be fired. *See* Jessica Madrid Dep. at 48-49

By letter dated August 22, 2003, Defendant Valdez terminated Plaintiff's employment with the County, effective August 29, 2003. *See* Defs.' Summ. J. Mem., Undisputed Fact 2 & Ex. 5. Defendant Valdez's purported reason for terminating Plaintiff's employment was that he "ceased to have trust in [Plaintiff] with regard to helping me." Valdez Dep. at 54. Defendant Valdez also believed that Plaintiff was not supportive of management and not cooperative. *Id.* at 157. Defendant Valdez also told the County Commissioners that his decision was based in part on discussions with other directors who were concerned about Plaintiff's service to them and her pushing her own agenda. *Id.* at 54-55. Defendant Valdez claims that his decision was additionally fueled by allegations from other directors that Plaintiff was screening out applicants that she did not want reviewed so that the applications would not appear before the decision-makers. *See id.* at 102-04.

## II.    PROCEDURAL HISTORY

On June 2, 2004, Plaintiff filed a one-count complaint against Defendants under 42 U.S.C.

---

[1]Although Defendant Morales stated in his deposition that Plaintiff had asked him to get rid of Defendant Valdez, *see* Morales Dep. at 48-49, this Court must construe the facts in the light most favorable to Plaintiff.

§ 1983 for violation of the First Amendment.  Plaintiff asserts that Defendants terminated her to

retaliate against her for "her failure to align herself politically with others, her free speech on

matters of public concern, her right to freedom in political actions outside of work, and her

providing truthful testimony related to litigation."  Compl. at ¶ 38.  On June 28, 2005, Defendants

filed a Motion for Summary Judgment (Doc. No. 35) and a Motion for Summary Judgment on

Qualified Immunity (Doc. No. 36).

## III.   STANDARD

### A.     Summary Judgment

Summary judgment is appropriate only if "'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527

(10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).   "All facts and reasonable inferences must be

construed in the light most favorable to the nonmoving party."  *Id.* (internal quotations omitted).

Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the

outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material

fact exists.  *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the

moving party meets its burden, the nonmoving party must show that genuine issues remain for

trial.  *Id.*  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific facts showing

that there is a genuine issue for trial.  *See id.*; *Kaus v. Standard Ins. Co.*, 985 F.Supp. 1277, 1281

(D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  There is no issue for

trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party.  *See Anderson*, 477 U.S. at 248.  The Court will consider Defendants' Motion for

Summary Judgment in light of these standards.

      **B.**     **Qualified Immunity**

     Under the doctrine of qualified immunity, "government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a defendant raises the

qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict

two-part test.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  The plaintiff

must demonstrate that the defendant violated a constitutional or statutory right and that the right

was clearly established at the time of the conduct.  *Id.*  "For a right to be clearly established, the

contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right."  *Jantzen v. Hawkins*, 188 F.3d 1247, 1258 (10th Cir. 1999)

(quoting *Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999)).  Furthermore, "in order for

the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on

point, or the clearly established weight of authority from other courts must have found the law to

be as the plaintiff maintains."  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th

Cir. 1992).  If the plaintiff establishes both elements of the qualified immunity test, then the

burden shifts back to the defendant to show there are no genuine issues of material fact and that

he is entitled to judgment as a matter of law. *Nelson*, 207 F.3d at 1206. The Court will address

the issues raised in Defendants' Motion for Summary Judgment on Qualified Immunity using this

framework.

## IV.   DISCUSSION

Plaintiff contends that Defendants violated her First Amendment rights of political

association and free speech. The Court will analyze both rights in turn.

### A.   Political Affiliation Retaliation

"The First Amendment protects public employees from discrimination based upon their

political beliefs, affiliation, or non-affiliation unless their work requires political allegiance."

*Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442, 1451 (10th Cir. 1997). Where a

government employer takes adverse action against an employee based on the employee's political

association and/or political beliefs, the Tenth Circuit applies the test developed in the *Elrod v.*

*Burns*, 427 U.S. 347 (1976) (plurality opinion), and *Branti v. Finkel*, 445 U.S. 507 (1980), line of

cases. *Jantzen*, 188 F.3d at 1251.

In *Elrod v. Burns*, the Supreme Court held that termination of a public employee based on

political affiliation and that does not serve a vital governmental interest violates the First

Amendment. 427 U.S. at 362-63. The Court nonetheless carved out an exception to this rule for

public employees who are in policymaking positions in order to prevent the undercutting of

representative government by tactics designed to obstruct the implementation of policies of new

administrations. *Id.* at 367-68. Patronage dismissals of public employees in policymaking

positions thus do not violate the First Amendment. *See id.*

The Supreme Court later clarified that the ultimate inquiry in political patronage cases under the First Amendment "is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980).  For First Amendment purposes, there is no meaningful distinction between nonpartisan political alignment and membership in a political party. *Bass v. Richards*, 308 F.3d 1081, 1091 (10th Cir. 2002).  Accordingly, in order to defeat a summary judgment motion, a plaintiff must establish a genuine dispute of fact that (1) political affiliation and/or beliefs were a substantial or motivating factor behind her dismissal; and (2) plaintiff's employment position did not require political allegiance. *Jantzen*, 188 F.3d at 1251.

In this case, Defendants argue that Plaintiff cannot establish a genuine dispute of fact that Plaintiff's position as Human Resource Director is not a policymaking position that requires political allegiance.  Defendants thus contend that Plaintiff's position falls within the *Elrond/Branti* exception such that Defendants could terminate Plaintiff based on her political alignment.

To determine whether political allegiance is an appropriate requirement for an employment position, courts must examine the nature of the employee's duties and responsibilities. *Jantzen*, 188 F.3d at 1253.  Specifically, courts "must focus on the inherent powers of the positions and the actual duties performed." *Id.*  Courts must look at the "whole picture" to determine if political allegiance is a proper job requirement. *Snyder v. City of Moab*, 354 F.3d 1179, 1185 (10th Cir. 2003).  Factors that indicate that the position requires political loyalty are whether the employee is a supervisor, whether the employee's responsibilities are not well-defined or of broad

scope, and whether the employee acts as an advisor or formulates plans for the implementation of

broad goals. *Id.* Whether political association is an appropriate requirement for the position is a

question of fact. *Barker v. City of Del City*, 215 F.3d 1134, 1138 (10th Cir. 2000). The

question, however, may be resolved as a matter of law if the relevant material facts are

undisputed. *See id.*

The undisputed facts before the Court in this case establish that Plaintiff's inherent powers

and actual duties demonstrate that political allegiance was an appropriate job requirement for her

position as Human Resource Director. First, Plaintiff, as the Human Resource Director, was part

of the County Manager's management team. She worked under the discretion and was

responsible to the County Manager. Plaintiff herself admitted that she was a high level

cabinet/management member of the County management team.

Second, as a director and high level management member, Plaintiff's position required

considerable contact with elected officials and other senior administration officials. Plaintiff

attended routine director meetings once a month with the County Commissioners and other

directors as well as a monthly meeting with staff. In these meetings, the directors discussed what

was occurring in each department and with what they needed help from other directors. The

Court thus finds that Plaintiff operated in a top management position in the County that needed to

be responsive to the elected Commissioners' goals and policies.

Third, Plaintiff admitted in her Complaint that she created the HRD, which indicates that

Plaintiff had broad responsibilities and goals. *See* Compl. at ¶ 11. Fourth, Plaintiff's job

description demonstrates that Plaintiff was responsible for the HRD budget. Defs.' Summ. J.

Mem., Ex. 2 at 2. Fifth, Plaintiff's job description is broad in scope. As Human Resource

Director, Plaintiff had "direct responsibility for planning, coordinating and directing personnel functions, including personnel policies and procedures." *Id.*, Ex. 2 at 1. Plaintiff was also expected to support the activities of the County Manager's Management Team and "represent the County on boards, commissions, and community organizations as assigned." *Id.* The following duties listed in Plaintiff's job description also indicate that Plaintiff's position included acting as an advisor or formulating plans for the implementation of broad goals: assisting departments and/or screening committees on proper interviewing and screening procedures; handling personnel grievances, including legal consultation, selection of third party hearing officers, and writing related reports and correspondence; assisting the County Manager in reviewing hiring, promotions, demotions, and terminations to determine compliance with all applicable laws and regulations; reviewing all personnel matters prior to being submitted to the County Manager for action or signature; advising the County Manager and other directors on personnel matters; and reviewing with County legal counsel and the County Manager all personnel matters as it relates to human resources. *Id.*, Ex. 2 at 1-2.

Sixth, both Plaintiff's job description and her actual performance demonstrate that Plaintiff was involved in advising and implementing policy, as well as recommending policy changes. According to her job description, one of Plaintiff's duties was to insure that all personnel policies, procedures, and objectives were followed. *Id.*, Ex. 2 at 1. Additionally, Plaintiff was to "recommend[] to the County Manager revisions to the personnel handbooks for County Commission approval." *Id.*, Ex. 2 at 2. The record also shows that Plaintiff took on policy matters as part of her actual duties. Plaintiff advised the County Manager and County legal counsel concerning whether the County was following certain policies and regulations, such as the

15

FMLA.  Plaintiff also attempted to ensure that the hiring of County employees was done in

accordance with the law and County procedures.  Although Plaintiff states that she did not have

the authority alone to set policy for the County, the record nonetheless reflects that Plaintiff was

involved in policy, if only as an advisor and implementer.  This involvement, however, is enough.

*See Flynn v. City of Boston*, 140 F.3d 42, 46 (1st Cir. 1998) ("[I]t is enough that the official be

*involved* in policy, . . . even if only as an adviser, implementer, or spokesperson. . . .").

     Finally, it is undisputed that Plaintiff's position was an unclassified, exempt position

outside the ambit of civil service protection.  Plaintiff understood that her position was "at will"

and that she could be terminated from her position with or without cause.  The County's

legislative decision to make the Human Resource Director position exempt rather than classified is

an additional factor suggesting that the position is a policymaking position.  *Cf. Salazar v. Rio

Arriba County*, 81 F.3d 173, *2 (10th Cir. 1996) (unpublished decision) (where public employer

has recognized that political affiliation is not appropriate job requirement by classifying position

and making employee subject for dismissal only for cause, it can be inferred position is exempt

from political patronage dismissal); *Stott v. Haworth*, 916 F.2d 134, 142 (4th Cir. 1990) (fact that

plaintiffs held exempt positions created presumption that political patronage dismissal was

proper); *Aiken v. Rio Arriba Board of County Commissioners*, 134 F.Supp.2d 1216, 1222

(D.N.M. 2000) ("[T]he County has created a presumption that the position of Special Projects

Director is a policymaking position, by making the position exempt rather than classified.  This

legislative decision is entitled to great weight.").

     The Court finds, based on all the above undisputed facts, that Plaintiff's position is more

comparable to the positions the Tenth Circuit concluded are subject to political patronage

dismissals. *Compare Snyder*, 354 F.3d at 1186 (defendants presented sufficient evidence to show that political loyalty was appropriate requirement for city treasurer position where position required dealing with public, determining city's cash requirements and investments, involvement with hiring within treasurer's department, and working under direction of City Manager and broad policy guidance of Mayor and City Council); *Barker*, 215 F.3d at 1138 (political association appropriate requirement for city manager's administrative assistant); *Green v. Henley*, 924 F.2d 185, 187 (10th Cir. 1991) (Director of Transportation Division of Kansas Corporation Commission held position for which termination based on political loyalty was acceptable where, among other things, he was required to plan, implement, direct, and evaluate policies established by Commission; participate in meetings with various governmental and industry representatives in which programs and policies were discussed; and testify on legislative bills as representative of Commission); *with Jantzen*, 188 F.3d at 1254-55 (jailer position did not require political loyalty; factual issue as to whether deputy sheriff position required political loyalty). *See also Aiken*, 134 F.Supp.2d at 1222-23 (holding that plaintiff's position as director of Special Projects for Rio Arriba County was properly subject to political affiliation dismissal where position was exempt rather than classified, plaintiff held one of highest positions in government hierarchy, plaintiff appeared at meetings and spoke as representative of County, plaintiff's job description was vague and open-ended, and plaintiff reported to County Commissioners and was expected to keep them directly informed of various projects on which he worked).[2]  The Court therefore concludes that

---

[2]The Court also finds the case on which Plaintiff relies, *Milazzo v. O'Connell*, 108 F.3d 129 (7th Cir. 1997), distinguishable.  There, the plaintiff was the human resources administrator for the Office of the Chief Judge, had no discretionary or autonomous authority, could not formulate personnel policy, did not have an intimate working relationship with the Chief Judge, and was supervised closely. *Id.* at 130, 132.  In contrast, here Plaintiff was the Director of the

the whole picture demonstrates that party affiliation is an appropriate requirement for the effective performance of Plaintiff's position as Human Resource Director.

The issue that necessarily follows is to what First Amendment claims the *Elrod/Branti* political patronage exception applies. Defendants attempt to lump all Plaintiff's speech claims under the *Elrod/Branti* exception. The Tenth Circuit, however, only applies the *Elrod/Branti* test to a government employer's adverse actions taken on account of an employee's political association and/or political beliefs. *Barker*, 215 F.3d at 1137. The *Elrod/Branti* test only applies when the speech implicates the employee's politics or substantive policy viewpoints. *See id.* at 1139. Speech on a matter of public concern unrelated to a plaintiff's politics or substantive policy positions, regardless of whether or not Plaintiff is a policymaking employee, is subject to the *Pickering/Connick* test, which is discussed below.

The Court finds that only Plaintiff's First Amendment claims based on her affiliation or non-affiliation with certain County Commissioners and dislike of the County Manager, as well as any expressions made by Plaintiff that reveals these associations, implicate her political viewpoints, and thus, the *Elrod/Branti* exception only applies to those claims. Plaintiff, however, also has First Amendment claims based on her election to the school board and on her speech related to jail safety conditions, alleged illegal hiring practices, and the failure to follow the FMLA

---

HRD for the County and was a high level cabinet member on the County's management team. Plaintiff not only created the HRD and was responsible for the HRD budget, but she also routinely met with and reported to the County Commissioners and other directors and had broad responsibilities over many discretionary matters. Additionally, Plaintiff's duties included making policy recommendations to the County Manager and advising and implementing policy. The Court therefore finds that the *Milazzo* case is not controlling. Furthermore, for these same reasons, the Court finds the case of *Garcia-Montoya v. State Treasurer's Office*, 1001-NMSC-003, 130 N.M. 25, 16 P.3d 1084, distinguishable.

and County drug testing policies.  The Court finds that this latter speech is unrelated to her politics and is therefore subject to the *Pickering/Connick* balancing test set forth below.  *Cf. Barker*, 215 F.3d at 1139 (applying *Pickering/Connick* balancing test to plaintiff's First Amendment claim based on speech concerning violations of Open Meetings Act).  Consequently, based on the *Elrod/Branti* analysis, Defendants are only entitled to summary judgment on Plaintiff's First Amendment claim based on her political alignment and on any expressions revealing her political alignment.[3]

### B.      Free Speech Retaliation

The Supreme Court has articulated a four-part test to determine whether a government employer violated a public employee's First Amendment speech rights.  *Jantzen*, 188 F.3d at 1257.  First, the court must determine whether the employee was speaking as a citizen upon a matter of public concern.  *Connick v. Myers*, 461 U.S. 138, 146 (1983).  If so, then the court must balance the interests of the employee, as a citizen, in expression upon matters of public concern and the government's interest "in promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  A plaintiff's speech is protected by the First Amendment only if her interest outweighs the government's interest.  *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998).  Third, if the first two requirements are met, the plaintiff must then show that the speech was a substantial

---

[3] For the same reasons Defendants are entitled to summary judgment on this claim, Defendants Morales, Coriz, Chavez, and Valdez are entitled to qualified immunity, because their conduct did not violate clearly established constitutional rights.  An official, looking at Plaintiff's duties as the Human Resource Director and the law at the time of Plaintiff's termination in August 2003, could reasonably believe that the position was political in nature, such that she could be terminated based on political patronage.

or motivating factor in the decision to terminate her.  *See Jantzen*, 188 F.3d at 1257.  Finally, the government must demonstrate that it would have reached the same decision regardless of the protected speech.  *Id.*  The first two steps are legal questions to be resolved by the court, while the latter two steps involve questions of fact to be resolved by the jury.  *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996).

> ### 1.      Speaking as a Citizen on a Matter of Public Concern

Speech involves a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community.  *Witham v. Baptist Health Care of Oklahoma, Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (quoting *Connick*, 461 U.S. at 146).  Speech pertaining to internal personnel disputes and working conditions, however, ordinarily does not involve public concern.  *Gardetto*, 100 F.3d at 812.  A public employee's First Amendment rights are not implicated when the public employee speaks not as a citizen on a matter of public concern, but instead as an employee upon matters of only personal interest.  *Connick*, 461 U.S. at 147.  As the Supreme Court explained, "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  *Connick*, 461 U.S. at 146.

While Defendants' motions were pending, the Supreme Court decided the case of *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006).  This decision changed the legal landscape of First Amendment speech retaliation cases by clarifying for the courts that they should initially focus on the question of whether a public employee was speaking as a *citizen* on a matter of public concern.  *Garcetti*, 126 S. Ct.  at 1960.

In *Garcetti*, a deputy district attorney, after examining an affidavit supporting a search warrant, wrote a memorandum to his superiors stating his concerns that the affidavit contained serious misrepresentations and recommending dismissal of the case. *Id.* at 1955-56. Despite the plaintiff's concerns, his superiors decided to proceed with prosecution. *Id.* at 1956. The trial court held a hearing on a defense motion concerning the legality of the warrant, and the plaintiff testified about his observations of the affidavit. *Id.* The trial court rejected the defense challenge to the warrant. *Id.* The plaintiff claimed that in the aftermath of these events he was subject to adverse employment actions, and he ultimately filed a 42 U.S.C. § 1983 claim based on violations of his First and Fourteenth Amendment rights. *Id.*

The Supreme Court concluded that the plaintiff's First Amendment rights were not violated because he was not speaking as a citizen on a matter of public concern. *See id.* at 1960. In so holding, the Court explained that when a citizen enters government service, he must accept certain limitations on his freedom in order for the government to provide efficient public services. *Id.* at 1958. The Court noted that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Id.* at 1959 (quoting *Connick*, 461 U.S. at 154). The Court nevertheless recognized that a citizen is still a citizen, and that employees speaking as citizens about matters of public concern must face only those speech restrictions necessary for the employers to operate efficiently and effectively. *Id.* at 1958.

In applying these principles to the case at hand, the Supreme Court concluded that the First Amendment did not protect the plaintiff's speech because "his expressions were made pursuant to his duties as a calendar deputy." *Id.* at 1959-60. The Court determined that the fact

that the plaintiff spoke as a prosecutor fulfilling his responsibility to advise his superiors about how best to proceed with a case was the dispositive factor. *Id.* at 1960. The Supreme Court therefore held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

In this case, Plaintiff argues that the following speech involved matters of public concern: (1) report on jail safety conditions and pending riot conditions; (2) reports on the County's failure to follow the FMLA and County drug testing requirements; (3) statements that the County did not follow proper procedures in hiring Manuel Sanchez; and (4) Plaintiff's candidacy and election to the school board. With the above principles in mind, the Court will examine each of these asserted speech rights to determine whether Plaintiff spoke as a citizen on a matter of public concern.

### a.       Jail Safety Conditions

There are two separate incidents involving Plaintiff's statements on jail safety conditions. The first occurred in 2000 when Plaintiff received correspondence from detention center employees who raised several issues concerning an unsafe work environment, including the possibility of a riot, at the detention center. Because of concerns for the safety of inmates and employees and the potential liability to the County, Plaintiff wrote a letter to the Detention Center Administrator and Defendant Valdez in which she strongly suggested that the detention center employees' concerns be addressed. Defendant Valdez did not address the concerns, and a riot occurred a few months later.

The Court finds that Plaintiff, in sending her letter, was not speaking as a citizen, but

22

rather as a government employee.  Although Plaintiff was not in charge of the detention center and did not have oversight of it, Plaintiff, as the Human Resource Director, was responsible for personnel grievances and all complaints filed with the court and state and federal agencies. Plaintiff's duties also included advising the County Manager and other directors on personnel and human resource issues.  Plaintiff attended monthly meetings with other directors to discuss what was going on in all the departments and to discuss what help they needed from other directors. Plaintiff received the letter from the detention center employees because of her position as Human Resource Director.  Plaintiff's response in sending a letter to the Detention Center Administrator and Defendant Valdez to address the employees' concerns was pursuant to her duties to advise the County Manager about personnel and human resource issues, which encompass employee complaints about working conditions.  Moreover, Plaintiff did not speak publicly, but rather made the expressions to other County employees.  The undisputed facts demonstrate that Plaintiff's speech was made pursuant to her duties as Human Resource Director, and not as a citizen, and thus, the speech is not of constitutional dimension.[4]

---

[4]In any event, even if Plaintiff could be deemed to have acted as a citizen in writing the letter, Defendants would nonetheless be entitled to summary judgment on Plaintiff's First Amendment claim based on the 2000 letter because Plaintiff cannot demonstrate that the letter was the substantial or motivating factor behind her termination.  Defendants did not terminate Plaintiff until August 29, 2003, approximately three years after Plaintiff wrote the letter.  Three years is too far removed in time to establish that the letter was the motivating factor for terminating Plaintiff.  *Cf. Candelaria v. EG & G Energy Measurements, Inc.*, 33 F.3d 1259, 1262 (10th Cir. 1994) (inference of retaliatory motive cannot be made where employee's relevant charges preceded employer's adverse action by as much as three years); *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir. 1982) (in Title VII suit, no inference of retaliatory motive permitted where employee's charges were not closely followed by adverse action; showing of termination almost three years after employee filed charges did not establish prima facie case of retaliation).  Plaintiff has shown no other evidence to establish that the 2000 letter was the reason for her termination.  Accordingly, Defendants are entitled to summary judgment on this basis as well.

As for Plaintiff's second conversation involving the jail, Plaintiff does not appear to be relying on this conversation to support her First Amendment claim, as her Complaint only contains facts regarding the 2000 letter. *See* Compl. ¶ 31. In any event, even if Plaintiff's claim did rely on these facts, Plaintiff was not speaking as a citizen on a matter of public concern when she engaged in this 2003 conversation.

On March 12, 2003, Plaintiff received a call from Billy Hinds who complained to her about the way Anthony Valdez was treating him. During this conversation, Defendant Morales came into Plaintiff's office and asked Plaintiff about the conversation. Plaintiff responded that she did not know how to address the detention center employees who contacted her and that she kept sending them back to Anthony Valdez. Plaintiff and Defendant Morales continued talking, discussing detention center employee complaints about faulty equipment, absenteeism, and working double shifts as well as the riot that had occurred years ago. Plaintiff never during this conversation said that a riot was going to happen. In fact, when Defendant Morales told Plaintiff that he needed to address the detention center, her response was, "Well, really? I think that they're trying to address it." The context and content of this speech indicates that it was made as a matter of personal interest, and not in an attempt to make the public aware of a community interest or to contribute to civic discourse. Furthermore, Plaintiff spoke in her role as Human Resource Director, and thus, Plaintiff was not attempting to speak as a citizen for First Amendment purposes. Accordingly, Plaintiff's speech concerning the detention center and its employees is not subject to First Amendment protections.

### b.    FMLA and Drug Testing

Plaintiff additionally asserts that in 2002 she "challenged" that the County's random drug

testing did not follow federal or county regulations, and the task was subsequently removed from her.  Plaintiff provides no further details as to the content, form, or context of her "challenge" or even to whom the challenge was made.  The Court nevertheless finds, based on the scant record before the Court, that Plaintiff made the challenge pursuant to her duties as the Human Resource Director.  At the time she made the challenge, the random drug testing task was part of Plaintiff's duties and Plaintiff's job responsibilities included ensuring that the County complied with County laws and policies.  The Court therefore concludes that Plaintiff made her speech concerning whether the County was following its drug testing policies as part of her employee duties.  The record does not indicate that Plaintiff was speaking as a citizen for First Amendment purposes, and thus, *Garcetti* forecloses the possibility that these statements constitute protected speech.

For similar reasons, the Court concludes that Plaintiff's statements to Defendant Valdez and the County Attorney that the County was out of compliance with the FMLA and to the County Attorney that Defendant Valdez was not letting Plaintiff get access to the necessary paperwork to be in FMLA compliance are not protected by the First Amendment.  Plaintiff made these statements pursuant to her duty to advise the County Manager and the County Attorney concerning human resource issues, particularly as to whether the County was complying with federal law.  Plaintiff herself explained that she "didn't have the documentation or the records, and so therefore I was not able to implement FMLA as required."  Rose Martinez Dep. at 71-72.  Plaintiff's statements to her superior and to legal counsel that she was not getting the necessary paperwork to complete the FMLA requirements were made according to her official duties as the Human Resource Director, and thus, Plaintiff was acting as a government employee, not a private citizen.  Consequently, these statements regarding the FMLA do not establish a First Amendment

violation.

**c.**      **Illegal Hiring Practices**

Plaintiff also argues that her speech concerning illegal hiring practices by the County is protected by the First Amendment. That speech consists of the following statements. Plaintiff advised Mr. Griego, Mr. Campos, Defendant Valdez, and Defendant Morales that hiring Manuel Sanchez might make the County liable and requested that the County follow its hiring procedures. When Plaintiff was unable to convince Defendant Morales to follow the standard procedures in hiring for the Equipment Operator position, Plaintiff documented the events. After Felix Archuleta filed suit against the County, R. Galen Reimer, an attorney for the County, called Plaintiff on May 27, 2003, for information on the case. Plaintiff told him about her views that the County did not follow its policies when hiring Manuel Sanchez. When Plaintiff asked Mr. Reimer what she should do if the case went to court, he told her to tell the truth. Plaintiff later indicated to Mr. Campos that she would tell the truth in Felix Archuleta's case that the hiring was political and did not follow County procedures.

The Court agrees that speaking out about illegal hiring practices, including nepotism, is a matter of public concern. *See Aiken*, 134 F.Supp.2d at 1220 (statements critical of cronyism and favoritism being rampant in the Rio Arriba County government system clearly concerned a topic of public concern). The question that remains, however, is whether Plaintiff was speaking as a citizen or as a government employee. Plaintiff's job duties included ensuring the County complied with all personnel policies and procedures and with state and federal law that related to hiring. Plaintiff also assisted the County Manager with the recruitment and selection process; assisted departments and/or screening committees on proper interviewing and screening procedures; was

26

responsible for personnel grievances, including legal consultation and writing related reports and correspondence; was responsible for all complaints filed with the courts or state or federal agencies; and advised the County Manager and other directors on personnel matters. Plaintiff's statements regarding her concerns that the County was not properly following its procedures when hiring Manuel Sanchez were made to her superiors and to another County director in the course of her duties. Plaintiff did not make her statements publicly. The subject matter of hiring Manuel Sanchez plainly related to her responsibilities as the Human Resource Director and Plaintiff spoke as the Human Resource Director when advising about following County procedures. *Cf. Garcetti*, 126 S. Ct. at 1960 (plaintiff spoke as prosecutor fulfilling responsibility to advise supervisor about how best to proceed with pending case).

Plaintiff's statements to Mr. Reimer, legal counsel for the County, explaining what occurred during the hiring of Manuel Sanchez and her views that the hiring did not follow County policy were similarly made pursuant to her duties. Plaintiff's duties included reviewing personnel matters with legal counsel and writing reports and correspondence concerning personnel grievances. Even when Plaintiff confirmed to her supervisor that she would tell the truth in any future legal proceeding, Plaintiff was acting in her role as Human Resource Director. Based on the record as a whole, the Court concludes that Plaintiff's statements concerning the hiring of Manuel Sanchez were not made as a citizen for First Amendment purposes, and thus, the speech is not entitled to First Amendment protection. As the Supreme Court explained: "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 126 S. Ct. at 1960.

27

### d.      School Board Candidacy and Election

Lastly, Plaintiff asserts that her free speech rights were violated when the County terminated her for running for and being elected to the school board.  Plaintiff's campaigning for the school board was clearly not speech related to her official duties as Human Resources Director for the County, and thus, Plaintiff spoke as a citizen.  Moreover, Plaintiff's political speech in running for school board is a matter of public concern.  *See Jantzen*, 188 F.3d at 1257 ("Haugland's political speech -- his candidacy for office -- undoubtedly relates to matters of public concern.").  Plaintiff therefore met the first element in the *Pickering/Connick* test as to this claim.

In sum, the only speech made by Plaintiff as a *citizen* on a matter of public concern is her candidacy and election to the school board.  The Court therefore only needs to examine the remaining *Pickering/Connick* requirements as to this speech.

### 2.      *Pickering* Balancing Test

Under the *Pickering* balancing test, the employer must demonstrate that terminating the employee was necessary to prevent the disruption of official functions.  *Dill*, 155 F.3d at 1203. The government, however, cannot rely on purely speculative allegations of governmental disruption.  *Gardetto*, 100 F.3d at 815-16.  The government must thus articulate specific reasonable concerns of harm that are made in good faith.  *Id.* at 816.  Relevant factors for this analysis include whether the speech impairs discipline by superiors or harmony among co-workers, has a detrimental impact on working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with normal governmental operations.  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

28

In this case, Defendants have not introduced any evidence of actual or potential disruption to government services caused by Plaintiff's campaigning and election to the school board. Defendant Valdez's reason for terminating Plaintiff was that he lacked trust in her, that she was not supportive of management, and that she pushed her own agenda. The record does not reflect that Defendants terminated Plaintiff because of any actual or perceived concern about disruption caused by her campaign and election to the school board. The *Pickering* balancing thus does not weigh in favor of Defendants. *See Gardetto*, 100 F.3d at 816 (*Pickering* analysis weighed in favor of employee where public employer did not demonstrate that plaintiff's demotion was because of any actual or perceived worry about disruption caused by her speech).

### 3.        Substantial or Motivating Factor in Termination

If the first two *Pickering/Connick* requirements are met, the plaintiff must then show that the speech was a substantial or motivating factor in the decision to terminate her. *See Jantzen*, 188 F.3d at 1257. The only facts in the record supporting this element are that Plaintiff ran for political office and was elected to the school board while she was working as the Human Resource Director. Plaintiff also points to the fact that when asked to rate Plaintiff's performance in her first three years, Defendant Valdez responded as follows:

> I think she was probably serious about her training and wanted to upgrade her skills and get professional and all that. But she didn't abandon all her other – her agenda, to keep herself politically alive in the Chama Valley, to stay visible, to have people support her on her school board political agenda, for whatever else she wanted to do.

Valdez Dep. at 101.

The Court finds that this evidence is insufficient to establish that Plaintiff's school board campaign and election were the motivating factors behind her termination. First of all, Defendant

Valdez's testimony is inconclusive and ambiguous at best.  *Cf. Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 746-47 (10th Cir. 1999) (plaintiff entitled to qualified immunity when he offered only doubtful and inconclusive evidence that could not demonstrate that his speech at arbitration was motivating factor in termination where plaintiff's evidence merely showed that officials were disappointed with outcome of arbitration, an official commented that plaintiff seemed encouraged by outcome, and official laughed in response to plaintiff's statement that he was being disciplined for his testimony).  Defendant Valdez's testimony may suggest that he felt that Plaintiff's school board election detracted from the seriousness of her job training, but it is too far a stretch to infer that Defendant Valdez terminated her because of her school board activity, especially when Defendant Valdez, when specifically asked the reasons for terminating Plaintiff, stated that he ceased to trust her, had complaints that she was screening out applicants that she did not want reviewed so that the applications would not appear before the decision-makers, and that she was not supportive of management.  Valdez Dep. at 54, 101-02, 157.  Moreover, Defendant Valdez specifically stated that he had no concerns one way or the other about Plaintiff's election activities outside the workplace.  *See id.* at 75.

Even more significant, the question was directed to Plaintiff's performance in her first three years as Human Resource Director – from 1998 through 2001.  *See id.* at 101-02.  Plaintiff was not terminated until August 2003.  More than a year and a half lag time between the purported protected speech and the termination is insufficient to justify an inference of causation.[5]

_____

[5]The record does not indicate when Plaintiff campaigned and was elected to the school board.  The only reference to a time period that the Court could find in the record was Defendant Valdez's deposition testimony, which suggested that Plaintiff was elected to the school board at some point prior to 2001.  *See* Valdez Dep. at 101-02.

*Cf. Stover v. Martinez*, 382 F.3d 1064, 1074 (10th Cir. 2004) (lapse of over two years between

alleged protected activity and adverse actions is too attenuated to support inference of causation);

*Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (suggesting four-month

lag time between participation in protected activity and termination by itself is not sufficient to

justify an inference of causation).  In sum, Plaintiff has not demonstrated direct or indirect

evidence that her school board candidacy and election were the substantial factors behind her

termination, and thus, Plaintiff cannot meet the third element of the *Pickering/Connick* test.

Defendants are therefore entitled to summary judgment on Plaintiff's First Amendment claim

based on her school board candidacy and election.  Because Plaintiff cannot demonstrate a clear

constitutional violation, Defendants Morales, Coriz, Chavez, and Valdez are also entitled to

qualified immunity.

## V.      CONCLUSION

The undisputed facts before the Court establish that political allegiance was an appropriate

job requirement for Plaintiff's position as Human Resource Director.  Defendants are therefore

entitled to summary judgment and Defendants Morales, Coriz, Chavez, and Valdez are entitled to

qualified immunity on Plaintiff's First Amendment claims based on her political alignment.

Defendants are also entitled to summary judgment and Defendants Morales, Coriz, Chavez, and

Valdez are entitled to qualified immunity on Plaintiff's First Amendment claims based on her

speech concerning jail safety and compliance with County drug testing policies, the FMLA, and

County hiring practices because Plaintiff was not speaking as a citizen for purposes of the First

Amendment.  Finally, Defendants are entitled to summary judgment and Defendants Morales,

Coriz, Chavez, and Valdez are entitled to qualified immunity on Plaintiff's First Amendment claim

arising out of her school board candidacy and election because Plaintiff cannot demonstrate that

her candidacy and election were the motivating factors that led to her termination.

**IT IS THEREFORE ORDERED** that

1.    Defendants' Motion for Summary Judgment (Doc. No. 35) is **GRANTED**; and

2.    Defendants' Motion for Summary Judgment on Qualified Immunity (Doc. No. 36)

is **GRANTED**.


Dated this 9th day of August 2006.


JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE